UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 0 7 2017

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

AVERY JAMES )
)
        Plaintiff, )
)
v. )
)
LIBERTY UNIVERSITY, )
)
and )
)                    Civil Action No. 6.17CV63
)
LEN STEVENS, )
both individually and in his official )
capacity as Executive Director of )
External Communications at Liberty )
University )
)
and )
)
SARAH BROWNING )
)
        Defendants. )
)

## COMPLAINT

THIS DAY CAME the Plaintiff, Avery James, by counsel, for his Complaint

against Liberty University, et al., on the following causes of action.

## PARTIES

1.      Plaintiff Avery James ("Mr. James") is a United States citizen who

resides and is domiciled in the State of South Carolina.

2.      Defendant Liberty University ("DEFENDANT LU") is a private liberal

arts university located in the City of Lynchburg, Virginia.

1

3.      Defendant Len Stevens ("DEFENDANT STEVENS") is a United States citizen who resides and is domiciled in the Commonwealth of Virginia.

4.      Defendant Sarah Browning ("DEFENDANT BROWNING") is a United States citizen who resides and is domiciled in the Commonwealth of Virginia.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000.00.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## FACTUAL ALLEGATIONS

7.      This case arises from DEFENDANT BROWNING's false accusations of sexual misconduct against Mr. James and other members of the Liberty University football team, and DEFENDANT LU and DEFENDANT STEVENS's mishandling, dissemination, and publication of the accusations to the press.

8.      In July 2016, DEFENDANT BROWNING alleged that Mr. James and several of his teammates had engaged in non-consensual sex with her during an party at the home of Tyrin Holloway on August 22-23, 2015 (the "Incident").

9.      DEFENDANT BROWNING's report to the Office of Community Life came nearly a year after the alleged Incident and within weeks after she had been dismissed from DEFENDANT LU for violations of its student conduct policy.

10.     DEFENDANT BROWNING's actions immediately after the Incident and in the year preceding her report – as recounted by multiple witnesses – was inconsistent with her claim that the encounter was non-consensual.

2

11.     As a result of DEFENDANT BROWNING's report, DEFENDANT LU,

initiated a university investigation pursuant to Title IX, 20 U.S.C. § 1681, *et seq.*

12.     DEFENDANT LU contacted the Lynchburg Police Department, which

began a criminal investigation into the alleged sexual misconduct.

13.     By July 2016, Mr. James was no longer a student at Liberty

University. He had enrolled at the University of South Carolina in order to live

closer to his family and to advance his academic and athletic career.

### *The Title IX Investigation*

14.     DEFENDANT LU's policies for investigating violations of Title IX are

outlined in *The Liberty Way*, attached as *Exhibit A,* and the *Liberty Sexual*

*Harassment, Discrimination, and Assault Policy,* attached as *Exhibit B.*

15.     DEFENDANT LU's policies create a motive for its students to fabricate

allegations of sexual misconduct and are implicitly biased against the male gender.

16.     DEFENDANT LU's policies impose strict sanctions, penalties, and

other discipline on students who engage in consensual sexual relations outside of

biblically ordained marriage, thereby making it foreseeable that persons accused of

engaging in such activity will claim the it was not consensual.

17.     Upon information and belief, DEFENDANT LU's policies affect male

students disproportionately to female students. The policies create an atmosphere

whereby women who engage in sexual activity and later claim the activity was

unwanted will benefit from a presumption of truth, while accused male students

3

who claim the activity was consensual are not afforded the same presumption, as the policies still punish even consensual sexual activity on campus.

18.     Upon information and belief, DEFENDANT LU's policies force accused male students into an impossible scenario: either the male student is subject to discipline for non consensual sexual contact, or if the male student claims truthfully that the sexual contact was consensual, the student is still subject to discipline. In each scenario, the presumption weighs against the male student.

19.     When DEFENDANT LU receives a report of a violation of the *Liberty Sexual Harassment, Discrimination, and Assault Policy*, it is required to conduct a Title IX initial inquiry and then, if sufficient evidence warrants further action, a formal investigation. At the conclusion of the formal investigation, the evidence gather is presented to a Conduct Review Committee for adjudication. The accused is given the right to appeal to the Judicial Review Board.

20.     DEFENDANT LU's subsequent revisions of the *Liberty Sexual Harassment, Discrimination, and Assault Policy* require DEFENDANT LU to notify the accused of his right to see copies of the records relied upon by DEFENDANT LU in its investigation before the meeting of the Conduct Review Committee.

21.     On July 23, 2016, Jonathan Ignacio, Associate Director with the Office of Community Life at DEFENDANT LU, emailed Mr. James to state that he was looking into a situation that may affect Mr. James's transcript at the University of South Carolina and to contact his office at his earliest convenience.

4

22.     On August 8, 2016, Mr. Ignacio emailed Mr. James a "Title IX letter" regarding DEFENDANT BROWNING's allegations that he had been involved in sexual misconduct during the Fall 2015 semester. Mr. James was invited to contact DEFENDANT LU to discuss further, which he did by telephone.

23.     On August 17, 2016, Mr. Ignacio asked Mr. James to provide a written statement for the investigation. He sent a statement denying the allegations.

24.     In mid-August 2016, a Lynchburg Police Department investigator contacted Mr. James to interview him about the allegations. Mr. James voluntarily met with the detective without counsel and denied the allegations.

25.     On August 31, 2016, Valerie Dufort, Assistant Director with the Office of Community Life at DEFENDANT LU, emailed Mr. James to say that his Title IX case was "coming to a close"; that the Conduct Review Committee would convene in two weeks to make a decision; and, if there was any information that Mr. James wanted to provide, he should submit it by September 1, 2016.

26.     Upon information and belief, when Ms. Dufort had spoken with potential witnesses during the investigation, she referred to Mr. James and the other accused men as "the offenders."

27.     When Ms. Dufort referred to Mr. James and the other accused men as "the offenders," even as the investigation was ongoing, it revealed a gender bias, wherein the men accused of sexual assault were presumed guilty.

28.     Upon information and belief, Ms. Dufort's biases affected her ability to fairly investigate the Incident and framed her subsequent presentation and recommendations to the Conduct Review Committee.

29.     When Ms. Dufort emailed Ms. James, she did not inform him whether he had a right to be present for the meeting of the Conduct Review Committee; whether he had a right to review any evidence against him; or, whether he had a right to confront or challenge any witnesses or evidence presented at the meeting.

30.     On September 2, 2016, Ms. Dufort emailed Mr. James to state that the Conduct Review Committee would meet on September 8, 2016, at 10:00 a.m., to make a decision in his case. She stated, "Your attendance is Not (sic) required for this meeting." She did not provide a location for the meeting.

31.     On September 8, 2016, the Conduct Review Committee met in Mr. James's case.

32.     Upon information and belief, the only evidence presented to the Conduct Review Committee on September 8, 2016, was delivered by Mr. Ignacio and Ms. Dufort in the form of written witness statements that summarized the Incident.

33.     Upon information and belief, the Conduct Review Committee did not actually meet with or interview all available witnesses; question he witnesses; or otherwise submit their testimonies to scrutiny prior to rendering a decision.

34.     Individuals who are found responsible for violating the *Liberty Sexual Harassment, Discrimination, and Assault Policy* face the following potential consequences: (a) up to 30 demerit points; (b) community services; (c) fines ranging

6

up to $500.00; (d) administrative withdrawal from DEFENDANT LU for a minimum of two semesters; (e) a transcript notation indicating the student was removed and/or disciplined for sexual assault.

35.     On September 12, 2016, DEFENDANT LU emailed Mr. James with the outcome of its September 8, 2016, meeting of the Conduct Review Committee.

36.     The Conduct Review Committee concluded Mr. James had engaged in non-consensual sexual contact with DEFENDANT BROWNING.

37.     Mr. James was given the harshest possible punishment i.e. withdrawal and a transcript notation.

38.     Mr. James was advised he had a right to appeal the decision to a hearing before the Judicial Review Board, constituting three faculty members, which would be scheduled within seven business days.

39.     Mr. James was advised that he would be allowed to be present for the appeal hearing along with an advisor to present testimony and documentation.

40.     On September 12, 2016, Mr. James informed DEFENDANT LU that was appealing the decision of the Conduct Review Committee.

### The September 12, 2016 Press Release

41.     On September 12, 2016, while Mr. James's appeal was pending, DEFENDANT LU issued a press release, attached as *Exhibit C*, stating,

"STATEMENT OF FINDINGS ON SEXUAL ASSAULT ALLEGATIONS

*LYNCHBURG, VA. – On July 13, 2016, Liberty University received a report of sexual assault alleged to have occurred off-campus in August 2015. Liberty University is committed to student safety and has a process in place for handling reports of sexual harassment, discrimination and assault involving*

7

*members of the university community, regardless of whether those cases occur
on- or off-campus. Liberty University has followed that process in this case,
which included convening its Threat Assessment Team, notifying and
cooperating with the Office of the Commonwealth's Attorney and the
Lynchburg Police Department pursuant to Virginia law and university policy,
and conducting a Title IX investigation and Conduct Review Committee
hearing concerning the reported allegations.*

*As a result of the investigation and a hearing held on September 8, 2016, two
current students, Cameron Jackson and Kyle Carrington, and one former
student, Avery James, were found responsible for violating the Student Honor
Code and Liberty University's Policy on Sexual Harassment, Discrimination,
and Assault. As part of the process, each of these students has a right to
appeal the Conduct Review Committee's decision. Both Mr. Jackson and Mr.
Carrington, as members of Liberty University's football team, were not
allowed to participate in the first two games of the season and are currently
suspended from the team pending the outcome of any appeal. In light of the
appeal process not being complete and an ongoing investigation by the
Lynchburg Police Department, the university will not provide further details
about the matter at this time.*

...

42.     Upon information and belief, DEFENDANT STEVENS authored and
published to media outlets the September 12, 2016, press release.

43.     Upon information and belief, DEFENDANT STEVENS was acting in
his capacity as an agent and employee of DEFENDANT LU when he authored and
published the September 12, 2016, press release.

44.     DEFENDANT LU and DEFENDANT STEVENS's press release of the
"Findings" against Mr. James was covered by every local television news station in
the Lynchburg area. The local newspaper also ran a story. It was picked up by the
Associated Press and stories appeared in national publications.

45.     Prior to the press release, no media outlet had published, broadcast, or
publicly disseminated any information related to the Incident.

8

46.     DEFENDANT LU and DEFENDANT STEVENS's press release stating that a "hearing" had been held on September 8, 2016, carried the false implication that a formal proceeding had taken place to weigh the evidence, call witnesses, and adjudicate the allegations. That day, no such hearing took place.

47.     DEFENDANT LU and DEFENDANT STEVENS's press release failed to mention that Mr. James had denied the allegations and had appealed, which carried the false implication that Mr. James assented to the allegations.

48.     DEFENDANT LU and DEFENDANT STEVENS's press release failed to mention that the Office of the Commonwealth's Attorney and the Lynchburg Police Department had not concluded its own investigation, which carried the false implication that local law enforcement supported the findings.

49.     Upon information and belief, DEFENDANT LU's decision to issue the press release was influenced, in part, by its strong desire to foster a public image that DEFENDANT LU was tough on Title IX allegations, in order to counteract any public criticism it might receive that fall for recruiting – and hiring – former Baylor University Athletic Director Ian McCaw for a position at DEFENDANT LU.

50.     Upon information and belief, DEFENDANT LU had been interested in hiring Mr. McCaw since shortly after he had resigned from Baylor in May 2016.

51.     Upon information and belief, DEFENDANT LU and its senior staff had discussed needing to act quickly should Mr. McCaw become available.

52.     Mr. McCaw had resigned from Baylor amid significant criticism of that university's handling of a highly publicized sexual assault scandal.

9

53.     Upon information and belief, DEFENDANT LU knew that its decision to recruit and hire Mr. McCaw would be controversial.

54.     Upon information and belief, DEFENDANT LU retained a Boston law firm to vet Mr. McCaw.

55.     Upon information and belief, DEFENDANT LU expended considerable resources and time in evaluating and pursuing Mr. McCaw, prior to its issuance of the September 12, 2016, press release regarding the Incident.

56.     Upon information and belief, prior to the September 12, 2016 press release, DEFENDANT LU knew that its ability to recruit and hire Mr. McCaw would be jeopardized if DEFENDANT LU appeared weak on Title IX allegations.

57.     Upon information and belief, the September 12, 2016 press release was issued hastily and in reckless disregard for the truth, in an effort to counteract and avoid any public criticism for its decision to recruit and hire Mr. McCaw.

58.     The immediate effect of the September 12, 2016 press release and subsequent publicity in local media outlets was to harass, intimidate, discourage, and humiliate Mr. James from participating in the ongoing Title IX process.

59.     Upon information and belief, the September 12, 2016 press release unduly corrupted the appeal process and put undue pressure on the faculty employees of DEFENDANT LU who later constituted the Judicial Review Board to subsequently affirm and uphold the prior decision against Mr. James.

10

## The October 3, 2016 Appeal Hearing

60.     On September 13, 2016, Mr. Ignacio notified Mr. James that his appeal hearing was scheduled for October 3, 2016, in Green Hall at DEFENDANT LU. He was advised that he had a right to review any records provided to the Conduct Review Committee and the Judicial Review Board prior to hearing.

61.     On September 29, 2016, counsel for Mr. James contacted the Office of the Commonwealth's Attorney to inquire about the status of its investigation into the allegations. Counsel asked DEFENDANT LU to delay the appeal hearing until after the criminal investigation had concluded. The request was denied.

62.     On October 3, 2016, Mr. James traveled to DEFENDANT LU and attended the appeal hearing before the Judicial Review Board.

63.     On October 3, 2016, DEFENDANT BROWNING appeared at the appeal hearing to repeat her allegations. She did so outside the presence of Mr. James, who was not allowed to be present while DEFENDANT BROWNING spoke.

64.     Upon information and belief, DEFENDANT BROWNING stated to the Judicial Review Board that she and Mr. James had engaged in non-consensual sexual contact during the evening of August 22-23, 2015, at an off-campus party.

65.     DEFENDANT BROWNING's statement on October 3, 2016, that she and Mr. James had engaged in non-consensual sexual contact with her during the evening of August 22-23, 2015, or at any time, was false.

66.     After DEFENDANT BROWNING concluded her statement, she exited the hearing, and Mr. James was invited to testify and present evidence.

11

## *Mr. James's Testimony at the Appeal Hearing*

67.     Mr. James testified that he had met DEFENDANT BROWNING the summer of 2015 at Liberty University. DEFENDANT BROWNING was a member of the Liberty University swim team.

68.     On the evening of August 22-23, 2015, Mr. James attended a party at 510 Victoria, Lynchburg, Virginia 24504, with his teammates on the Liberty University football team. DEFENDANT BROWNING was in attendance.

69.     During the party, DEFENDANT BROWNING came up to members of the football team at the party and offered to perform oral sex on them outside the house. Mr. James was not one of those individuals, but he heard her say it.

70.     As the night progressed, Mr. James, along with DEFENDANT BROWNING, Cameron Jackson, and others, left the party to go to an apartment belonging to Tyrin Holloway and Spencer Cook, two other students.

71.     Mr. James entered the apartment. He met up with Ashley Osborne and her friend, Rachel, who had traveled to Lynchburg that weekend. Rachel, Ms. Osborne, and Mr. James went into another room to hang out with Mr. Holloway.

72.     Soon, they heard what sounded like sexual intercourse coming from the living room. They walked to the hallway and saw DEFENDANT BROWNING and Mr. Jackson having intercourse. Embarrassed, they left and went back to the bedrooms to fell asleep for the night. The next morning, DEFENDANT BROWNING had left and Mr. James and his teammates went to practice.

12

73.     Several weeks later, DEFENDANT BROWNING continued to try and date or "hook up" with members of the football team, including Mr. James.

74.     DEFENDANT BROWNING gained a reputation among the football players for how she acted. Certain football players gave her a nickname to reflect the fact that she flaunted her promiscuity.

75.     In Fall 2015, as rumors circulated within the athletic department, there was an anonymous post on Yik Yak stating a student athlete on the swim team, in an apparent reference to DEFENDANT BROWNING, had attended an off-campus party on August 22-23, 2015, and had been "forced" into oral sex with a number of members of the football team.

76.     The school investigated the matter. DEFENDANT BROWNING was interviewed by Erin Hagen, an Athletic Department employee at DEFENDANT LU.

77.     According to a note that Ms. Hagen provided to DEFENDANT LU, on or about October 19, 2015, Ms. Hagen met with DEFENDANT BROWNING to discuss the Incident. DEFENDANT BROWNING denied that she had been assaulted and told Ms. Hagen that she was "not forced" to do anything.

78.     After the matter was initially investigated, no action was taken.

79.     As the semester progressed, Mr. James said he and others on the Liberty University football team would date DEFENDANT BROWNING. She sent him and other multiple social media messages to get together.

80.     But after the rumors had circulated, Mr. James and others on the football team stopped returning her overtures to date.

13

81.     DEFENDANT BROWNING told mutual friends that she would "get back" at the football players for ignoring her and "take the whole team down."

82.     DEFENDANT BROWNING later left DEFENDANT LU for disciplinary reasons. Soon thereafter, she made the instant allegations.

### Witnesses Discredit Defendant Browning

83.     After testifying, Mr. James presented affidavits to the Judicial Review Board from three individuals who were present on or about August 22-23, 2015, discrediting the testimony of DEFENDANT BROWNING:

a.      Tegan Quinton: Ms. Quinton was a student at Liberty University during the 2015 academic year. She was DEFENDANT BROWNING's best friend on campus. She attested that DEFENDANT BROWNING had a reputation for promiscuity and bragged about the number of men she slept with at school. The day after the party, Ms. Quinton met DEFENDANT BROWNING to give her a car ride. DEFENDANT BROWNING told Ms. Quinton that she had a "wild" night the evening before and "performed oral sex" on a number of players on the football team. During the school year, DEFENDANT BROWNING continued to date a number of players on the football team, including Mr. James. She sent messages on social media to "hook up," until rumors began circulating about her promiscuity and team members started ignoring her. DEFENDANT BROWNING told Ms. Quinton that when they ignored her, she became upset and said she would "get them back."

b.      Ashley Osborne: Ms. Osborne was a student at Liberty University during the 2015 academic year. She was at the home of Tyrin Holloway on August 23, 2015, when DEFENDANT BROWNING claimed she was sexually assaulted by Mr. James. She attested that DEFENDANT BROWNING was not intoxicated. She said DEFENDANT BROWNING and Cameron Jackson had loud consensual sex in the living room of the house and in the presence of other people at the party. At no time did she witness any inappropriate contact between Mr. James and DEFENDANT BROWNING.

c.      Spencer Cook: Mr. Cook was a student at Liberty University during the 2015 academic year. was at the home of Tyrin Holloway on August 23, 2015, when DEFENDANT BROWNING claimed she was sexually assaulted by Mr. James. He attested that DEFENDANT BROWNING was not intoxicated. He witnessed DEFENDANT BROWNING and Cameron Jackson having loud consensual intercourse at the apartment and did not witness Mr. James have any contact with her that night.

84.     Mr. James also presented social media posts by DEFENDANT BROWNING that appear to have been posted the day of the appeal hearing.

85.     On DEFENDANT BROWNING's Snapchat profile, she posted what appeared to be videos of her smoking a marijuana joint and gesturing to the camera at a campus apartment in Lynchburg, Virginia, just prior to the hearing.

86.     Upon information and belief, no other witnesses, other than Mr. James and DEFENDANT BROWNING, testified at his appeal.

87. The following day, DEFENDANT LU notified Mr. James of its decision upholding the findings of the Conduct Review Committee.

88. Within hours of learning of the decision, Mr. James learned that the Office of the Commonwealth's Attorney had declined to prosecute the case after concluding its own investigation with the aid of the Lynchburg Police Department.

89. As a result of the decision, DEFENDANT LU sent Mr. James a letter informing him that his academic transcript would be marked with a notation stating, "Student has been dismissed for a violation of the Liberty Way."

90. The notation would remain on Mr. James's transcript until he applied for good standing after July 1, 2017, to have the notation lifted.

### *Damages*

91. DEFENDANT BROWNING's false accusations and DEFENDANT LU and DEFENDANT STEVENS's mishandling and publication of the accusations, have ruined Mr. James's once-promising academic and athletic careers.

92. In the summer months prior to the investigation, Mr. James had been accepted by the University of South Carolina to further his education. He joined the football team as a walk-on member and was on track to earn a full scholarship.

93. Prior to attending the University of South Carolina and walking onto its football team, Mr. James had been a top recruit at DEFENDANT LU and had started as a freshman member of its football team.

94.     But in mid-August 2016, as Mr. James prepared for the upcoming season with teammates at the University of South Carolina, DEFENDANT LU told the school that Mr. James was under investigation for sexual misconduct.

95.     Mr. James was at football practice at the University of South Carolina and pulled off the field in front of the entire team.

96.     Mr. James was extremely embarrassed when he was told of the charge because he knew it was not true.

97.     Mr. James was removed from the football team and not permitted to participate in athletic activities pending the outcome of the investigation.

98.     Several weeks later, on September 12, 2016, DEFENDANT LU and DEFENDANT STEVENS issued its false and misleading press release suggesting Mr. James had been found guilty of sexual misconduct.

99.     On October 3, 2016, DEFENDANT LU held a hearing during which DEFENDANT BROWNING repeated her false accusations that Mr. James had sexually assaulted her during the August 2015 party.

100.    As a result of DEFENDANT BROWNING's testimony, DEFENDANT LU found against Mr. James and placed the notation on his transcript.

101.    DEFENDANT LU notified the University of South Carolina that Mr. James had been adjudicated guilty of the student conduct charge.

102.    As a result of DEFENDANT BROWNING's false statements and DEFENDANT LU's publicity of the statements and associated punishment, the University of South Carolina informed Mr. James that he was no longer permitted

to participate in any manner in any extracurricular activities at the school; and, Mr. James was assigned a curfew banning him campus, except to attend classes.

103.    Mr. James attempted to go to one football game to support the team and was escorted out by campus security. He was told, "You are not allowed to be at school functions or be on campus, we were told to watch for you, A.J."

104.    Mr. James felt physically ill and experienced severe stomach aches, trouble sleeping, and migraine headaches, related to the stress that he endured as a result of the false charges by DEFENDANT BROWNING and DEFENDANT LU and DEFENDANT STEVENS's publicity of the charges.

105.    Mr. James felt humiliated, embarrassed, and isolated from the school and his fellow students.

106.    Mr. James, who was living at an off-campus apartment building that housed the entire football team, was excluded by his peers. He would stay in his room and just sleep due to depression and exclusion.

107.    Mr. James would skip meals and not eat because he could not go to the on-campus cafeteria or associate with his teammates to eat off-campus.

108.    Mr. James could not utilize the on-campus library or learning centers due to the curfew that had been imposed as a result of the charges, and as a result, his grades began to suffer.

109.    Mr. James lost weight due to the stress – more than 30 pounds in less than two months - and developed a stress rash which required medical treatment.

110.    Mr. James contemplated suicide and felt worthless.

111. Rumors circulated at school, and some students who were complete strangers to Mr. James would call him a "predator."

112. Furthermore, the news stories that appeared online as a result of DEFENDANT LU and DEFENDANT STEVENS's press release on September 12, 2016, haunted Mr. James when he moved home to South Carolina.

113. The local and national stories appeared online when anyone searched for Mr. James's name on the Internet.

114. For example, extended family members learned of the false accusations when they searched Mr. James's name online; as a result, he was shunned by some family at gatherings, which had a devastating effect on him.

115. Additionally, Mr. James had volunteered at his younger sister's school as an after-school counselor after moving home.

116. But when a parent at the school found the stories online related to the accusations – published as a result of DEFENDANT LU and DEFENDANT STEVENS's press release – he was told to leave the school.

117. Leaving his job as an after-school counselor was mortifying for Mr. James. He had gone to the school as a child; his siblings attended the school; and, his parents were active in the school's events. The perception of the family changed within their community.

118. Several of Mr. James's younger siblings' friends are not permitted to come to their house because of the accusations due to the stories in the media.

19

119. In summary, the false accusations have had a devastating effect on Mr. James and his future.

120. Prior to this incident, Mr. James was a confident, trusting, caring person, who dreamed of a successful career in professional football and coaching.

121. As a result of DEFENDANT BROWNING's false accusations on October 3, 2016, and DEFENDANT LU and DEFENDANT STEVENS's inexplicable decision to publish the accusations even as the case was still pending on September 12, 2016, Mr. James has been severely and irreparably damaged. He has suffered extraordinary harm to his once-promising academic and athletic career as a student athlete at an SEC football program; loss of earnings; loss of funds to pursue a college education; loss of reputation and good name; loss of future earnings; mental and physical suffering; and, stress, emotional hurt, and humiliation.

## COUNT I – VIOLATION OF TITLE IX
### (Liberty University)

122. Mr. James realleges the foregoing paragraphs.

123. Title IX, 20 U.S.C. § 1681, *et seq.*, states, in pertinent part:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance."

124. DEFENDANT LU and its athletic department constitute an education program that receives federal financial assistance, including but not limited to hundreds of millions of dollars in federal aid awarded to its students each year.

125. Under Title IX, a school must "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any

20

action which would be prohibited by" Title IX or the regulations thereunder, including all forms of sexual harassment or sexual assault. *See* 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice)..

126. The procedures adopted by the school must "ensure the Title IX rights of the complainant" and "accord[] due process to both parties involved..." *See*, U.S. Dept. of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001), p. 22.

127. Schools must implement procedures that, at a minimum, provide "adequate, reliable, and impartial investigation of complaints, *including the opportunity to present witnesses and other evidence.*" *Id.* at 20 (emphasis added).

128. DEFENDANT LU deprived Mr. James, on the basis of his gender, of his rights of due process and equal protection through its improper application and administration of its policies to the Incident.

129. DEFENDANT LU conducted its investigation of the Incident in a manner that was biased against Mr. James on the basis of his gender.

130. DEFENDANT LU failed to provide Mr. James with adequate due process at the meeting of the Conduct Review Committee with an *"opportunity to present witnesses and other evidence"* in that he was not informed of his right to testify; to confront his accuser; to present evidence; or even attend and observe the proceedings as he was not even given the location of the meeting.

Case 6:17-cv-00063-NKM-RSB   Document 1   Filed 09/07/17   Page 21 of 36   Pageid#: 21

131.   Furthermore, the Conduct Review Committee's formal hearing and the appeal to the Judicial Review Board were slanted against Mr. James and in favor of DEFENDANT BROWNING notwithstanding the witnesses who undermined the accusations and the evidence that weighed against the findings. The decision of the Conduct Review Committee and Judicial Review Board had no rational basis in fact and can only be explained by DEFENDANT LU's discriminatory and inadequate procedures and predetermination of guilty in its investigation of Mr. James.

132.   DEFENDANT LU created an environment where a male student such as Mr. James who had engaged with consensual sexual activity with an accuser is fundamentally denied due process by being prosecuted throughout the Title IX process under a presumption of guilt on the basis of his gender.

133.   DEFENDANT LU's decision to uphold a finding of sexual assault and render the harshest available sanction against Mr. James was unfairly influenced by DEFENDANT LU's desire to recruit and retain Ian McCaw and its fear that negative publicity over a Title IX investigation could jeopardize that process.

134.   DEFENDANT LU's decision to issue a press release announcing Mr. James's guilt – even as the Title IX process was still pending on appeal – unfairly prejudiced the investigatory process and influenced the Judicial Review Board's decision to uphold the Conduct Review Committee's finding.

135.   DEFENDANT LU's policies are set up in a way that disproportionately affects male students in a foreseeable manner, without appropriate policies to promote equal protection.

22

136. DEFENDANT LU's policies in sexual misconduct cases discriminate against male students on the basis of their gender.

137. DEFENDANT LU's policies, and its actions in investigating and punishing Mr. James, amounted to gender bias against Mr. James.

138. As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

139. As a result of the foregoing facts, Mr. James is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

140. DEFENDANT LU's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT II – DEFAMATION BY IMPLICATION
### (Liberty University)

141. Mr. James realleges the foregoing paragraphs.

142. On September 12, 2016, DEFENDANT STEVENS, working as an agent of DEFENDANT LU, authored, published, and distributed a press release under the headline, "Statement of Findings on Sexual Assault Allegations."

143. The press release is attached hereto as *Exhibit C*.

144.    The press release withheld significant relevant facts, including but not limited to the following: (a) Mr. James had asserted, and continued to assert, his innocence; (b) Mr. James had demanded an appeal; (c) Mr. James did not attend or participate in the September 8, 2016, meeting of the Conduct Review Committee as he was not informed of its time or location, and further, was advised that he need not attend; (d) Mr. James was not provided with the evidence against him prior to the September 8, 2016, meeting of the Conduct Review Committee; and, (e) Mr. James was not offered an opportunity to confront witnesses against him.

145.    The press release omitted the facts referenced in paragraph 115 in an effort to convince the readers that the matter involving Mr. James had been fairly and thoroughly investigated and that the Conduct Review Committee's findings were accurate – to the prejudice of Mr. James.

146.    The acts and omissions that resulted in the creation and distribution of the press release prioritized DEFENDANT LU's public image over accuracy and fairness, and in reckless disregard for the truth.

147.    The decision to prioritize DEFENDANT LU's own public image over accuracy and fairness to Mr. James is indicative of malice.

148.    The context and circumstances surrounding the publication of the press release reasonably caused the statement to convey a defamatory meaning to its recipients.

149. The statements referenced in the press release, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. James did, in fact, commit the alleged sexual assault.

150. The implication that Mr. James committed a sexual assault is false.

151. A statement falsely implying that a person has committed a sexual assault is defamatory.

152. The statements referenced in the press release, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. James had been found responsible for a sexual assault despite attempts to defend himself at a hearing on September 8, 2016, This bolstered the overall implication that Mr. James had, in fact, committed the sexual assault.

153. The implication that Mr. James was found responsible for sexual assault despite attempts to defend himself at a hearing on September 8, 2016, is false. This false implication bolstered the overall implication that Mr. James had, in fact, committed the sexual assault.

154. The statements referenced in the press release suggest that DEFENDANT LU had followed the process outlined in the *Liberty Sexual Harassment, Discrimination, and Assault Policy.*

155. Based on the foregoing facts, the implication that DEFENDANT LU had followed its policy in this case is false. This false implication bolstered the overall implication that Mr. James had, in fact, committed the sexual assault.

156. The press release, while noting that Mr. James had the right to appeal, withheld the significant fact that Mr. James had already reasserted his innocence and demanded an appeal. This omission highlights DEFENDANT LU's intent to imply guilty while suppressing any information tending to suggest innocence.

157. DEFENDANT LU published the press release with reckless disregard for the truth.

158. DEFENDANT LU published the press release to multiple local news organizations.

159. DEFENDANT LU intended the news organizations to believe the statements and implications contained in the press release, and to use the press release to develop and publish news stories for mass consumption by the public.

160. Multiple news stories repeated the statements and implications contained in the press release.

161. As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

162. As a result of the foregoing facts, Mr. James is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

163. DEFENDANT LU's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation,

26

health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT III – DEFAMATION PER SE
### (Liberty University)

164.    Mr. James realleges the foregoing paragraphs.

165.    DEFENDANT LU's press release maliciously published defamatory statements about Mr. James to multiple media outlets and the public.

166.    DEFENDANT LU's press release was defamatory and falsely implied that Mr. James had committed a sexual assault.

167.    DEFENDANT LU's press release falsely implied Mr. James had committed a crime, i.e. sexual assault, so egregious and so inherently harmful as to constitute defamation *per se*.

168.    As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

169.    As a result of the foregoing facts, Mr. James is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

170.    DEFENDANT LU's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

27

## COUNT IV – DEFAMATION BY IMPLICATION
## (Len Stevens)

171.    Mr. James realleges the foregoing paragraphs.

172.    On September 12, 2016, DEFENDANT STEVENS authored, published, and distributed a press release under the headline, "Statement of Findings on Sexual Assault Allegations."

173.    The press release is attached hereto as *Exhibit C*.

174.    The press release withheld significant relevant facts, including but not limited to the following: (a) Mr. James had asserted, and continued to assert, his innocence; (b) Mr. James had demanded an appeal; (c) Mr. James did not attend or participate in the September 8, 2016, meeting of the Conduct Review Committee as he was not informed of its time or location, and further, was advised that he need not attend; (d) Mr. James was not provided with the evidence against him prior to the September 8, 2016, meeting of the Conduct Review Committee; and, (e) Mr. James was not offered an opportunity to confront witnesses against him.

175.    The press release omitted the facts referenced in paragraph 115 in an effort to convince the readers that the matter involving Mr. James had been fairly and thoroughly investigated and that the Conduct Review Committee's findings were accurate – to the prejudice of Mr. James.

176.    The acts and omissions that resulted in the creation and distribution of the press release prioritized DEFENDANT LU's public image over accuracy and fairness, and in reckless disregard for the truth.

28

177.     The decision to prioritize DEFENDANT LU's own public image over accuracy and fairness to Mr. James is indicative of malice.

178.     The context and circumstances surrounding the publication of the press release reasonably caused the statement to convey a defamatory meaning to its recipients.

179.     The statements referenced in the press release, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. James did, in fact, commit the alleged sexual assault.

180.     The implication that Mr. James committed a sexual assault is false.

181.     A statement falsely implying that a person has committed a sexual assault is defamatory.

182.     The statements referenced in the press release, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. James had been found responsible for a sexual assault despite attempts to defend himself at a hearing on September 8, 2016, This bolstered the overall implication that Mr. James had, in fact, committed the sexual assault.

183.     The implication that Mr. James was found responsible for sexual assault despite attempts to defend himself at a hearing on September 8, 2016, is false. This false implication bolstered the overall implication that Mr. James had, in fact, committed the sexual assault.

29

184. The statements referenced in the press release suggest that DEFENDANT LU had followed the process outlined in the *Liberty Sexual Harassment, Discrimination, and Assault Policy.*

185. Based on the foregoing facts, the implication that DEFENDANT LU had followed its policy in this case is false. This false implication bolstered the overall implication that Mr. James had, in fact, committed the sexual assault.

186. The press release, while noting that Mr. James had the right to appeal, withheld the significant fact that Mr. James had already reasserted his innocence and demanded an appeal. This omission highlights DEFENDANT LU's intent to imply guilty while suppressing any information tending to suggest innocence.

187. DEFENDANT STEVENS published the press release with reckless disregard for the truth.

188. DEFENDANT STEVENS published the press release to multiple local news organizations.

189. DEFENDANT STEVENS intended the news organizations to believe the statements and implications contained in the press release, and to use the press release to develop and publish news stories for mass consumption by the public.

190. Multiple news stories repeated the statements and implications contained in the press release.

191. As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress,

loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

192. As a result of the foregoing facts, Mr. James is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

193. DEFENDANT STEVENS's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT V – DEFAMATION PER SE
### (Len Stevens)

194. Mr. James realleges the foregoing paragraphs.

195. DEFENDANT LU's press release maliciously published defamatory statements about Mr. James to multiple media outlets and the public.

196. DEFENDANT LU's press release was defamatory and falsely implied that Mr. James had committed a sexual assault.

197. DEFENDANT STEVENS's press release falsely implied Mr. James had committed a crime, i.e. sexual assault, so egregious and so inherently harmful as to constitute defamation *per se.*

198. As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

31

199. As a result of the foregoing facts, Mr. James is entitled to damages in the amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

200. DEFENDANT STEVENS's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT VI – DEFAMATION
### (Sarah Browning)

201. Mr. James realleges the foregoing paragraphs.

202. On October 3, 2016, DEFENDANT BROWNING reported to agents of DEFENDANT LU at the Judicial Review Board hearing that she had been sexually assaulted by Mr. James, at an off-campus party on August 22-23, 2015.

203. Mr. James never sexually assault DEFENDANT BROWNING.

204. DEFENDANT BROWNING's October 3, 2016, statements were false.

205. At the time that she made the statements about Mr. James, DEFENDANT BROWNING knew that the statements were not true.

206. A statement falsely stating or implying that a person has committed a sexual assault is defamatory.

207. DEFENDANT BROWNING's false statements about Mr. James conveyed a defamatory meaning to their recipients.

208. The persons who received DEFENDANT BROWNING's defamatory statements believed the statements to be true.

32

209.    As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

210.    As a result of the foregoing facts, Mr. James is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

211.    DEFENDANT BROWNING's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT VII – DEFAMATION PER SE
### (Sarah Browning)

212.    Mr. James realleges the foregoing paragraphs.

213.    On October 3, 2016, DEFENDANT BROWNING reported to agents of DEFENDANT LU at the Judicial Review Board hearing that she had been sexually assaulted by Mr. James, at an off-campus party on August 22-23, 2015.

214.    Mr. James never sexually assault DEFENDANT BROWNING.

215.    DEFENDANT BROWNING's October 3, 2016, statements were false.

216.    At the time that she made the statements about Mr. James, DEFENDANT BROWNING knew that the statements were not true.

217.    A statement falsely stating or implying that a person has committed a sexual assault is defamatory.

33

218.   DEFENDANT BROWNING's false statements about Mr. James conveyed a defamatory meaning to their recipients.

219.   The persons who received DEFENDANT BROWNING's defamatory statements believed the statements to be true.

220.   DEFENDANT BROWNING false statement that Mr. James had committed a crime, i.e. sexual assault, so egregious and so inherently harmful as to constitute defamation *per se*.

221.   As a direct and proximate result of the above conduct, Mr. James sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

222.   As a result of the foregoing facts, Mr. James is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

223.   DEFENDANT BROWNING's conduct was malicious, reckless, wanton, egregious, and in total disregard for Mr. James's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

34

## PRAYER FOR RELIEF

WHEREFORE, Mr. James requests the Court award the following relief, and enter a judgment against DEFENDANT LU:

a. On counts I, II, and III, an award in the amount of FIFTY MILLION DOLLARS ($50,000,000.00), in actual and presumed damages as compensation for the general damage to Mr. James's reputation, and in compensation for the damage done to his mental, emotional, and physical health and well-being, plus punitive damages, prejudgment interest, attorneys' fees, expenses, and court costs; and,

a judgment against DEFENDANT STEVENS:

a. On counts IV and V, an award in the amount of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), in actual and presumed damages as compensation for the general damage to Mr. James's reputation, and in compensation for the damage done to his mental, emotional, and physical health and well-being, plus punitive damages, prejudgment interest, attorneys' fees, expenses, and court costs; and,

a judgment against DEFENDANT BROWNING:

a. On counts VI and VII, an award in the amount of FIFTY MILLION DOLLARS ($50,000,000.00), in actual and presumed damages as compensation for the general damage to Mr. James's reputation, and in compensation for the damage done to his mental, emotional, and

physical health and well-being, plus punitive damages, prejudgment

interest, attorneys' fees, expenses, and court costs.

A TRIAL BY JURY IS DEMANDED.

September 7th, 2017       Respectfully submitted,

AVERY JAMES

By _____
                 Of Counsel

Robert E. Dean, Esq. (VSB No. 80288)
ROB DEAN LAW
401 Campbell Ave., Ste. 302
Roanoke, Virginia 24016
Phone: (540) 585-1776
Fax:     (540) 301-0833
Email: rob@robdeanlaw.com

*Counsel for Plaintiff*